2013-1640

# United States Court of Appeals
# for the Federal Circuit

---

FENNER INVESTMENTS, LTD.,

*Plaintiff-Appellant,*

*v.*

CELLCO PARTNERSHIP (DOING BUSINESS AS VERIZON WIRELESS)

*Defendant-Appellee.*

---

*Appeal from the United States District Court for the Eastern District of Texas in case no. 11-CV-0348, Chief Judge Leonard Davis*

---

## RESPONSE BRIEF OF DEFENDANT-APPELLEE

CAREN K. KHOO
VERIZON CORPORATE
  RESOURCES GROUP, INC.
One Verizon Way, VC 54N073
Basking Ridge, NJ 07920
(908) 559-5668
caren.khoo@verizon.com

GEOFFREY P. EATON
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5705
geaton@winston.com

KEVIN P. ANDERSON*
KARIN A. HESSLER
WILEY REIN LLP
1776 K St. NW
Washington, DC 20006
(202) 719-7000
kanderson@wiley.com
khessler@wiley.com

\* Counsel of Record

*Attorneys for Defendant-Appellee Cellco Partnership
(doing business as Verizon Wireless)*

January 24, 2014

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 28(a)(1) and 47.4(a), counsel for Defendant-Appellee Cellco Partnership (doing business as Verizon Wireless) certifies the following:

1.    The full name of every party or amicus represented by us is:

Cellco Partnership (doing business as Verizon Wireless)

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

None.

3.    All parent corporations and any publicly held companies that own 10% or more of the stock of any party represented by us are:

Cellco Partnership is a general partnership formed under Delaware law in which Verizon Communications Inc. and Vodafone Group Plc indirectly hold 55 percent and 45 percent partnership interests, respectively. Both Verizon Communications Inc. and Vodafone Group Plc are publicly traded companies.

4.    The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or expected to appear in this court are:

Wiley Rein LLP (Kevin P. Anderson, Karin A. Hessler, Floyd B. Chapman)
Potter Minton PC (Mike Jones, Allen Gardner, Patrick Clutter)
Winston & Strawn LLP (Geoffrey P. Eaton)


Dated:  January 24, 2014                              /s/  Geoffrey P. Eaton

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF RELATED CASES ...................................................1

STATEMENT OF THE ISSUES............................................................2

INTRODUCTION AND SUMMARY OF ARGUMENT .......................3

BACKGROUND ...................................................................................6

ARGUMENT ........................................................................................9

I.   The Intrinsic Evidence Overwhelmingly Demonstrates That
     The District Court's Construction Of "Personal Identification
     Number" Is Correct. ................................................................10

     A.   The patent expressly defines "PIN" to exclude numbers
          "associated with" a device. ...........................................11

     B.   Reading the specification "as a whole" confirms that
          Fenner's lexicography must be given its full effect..................13

          1.  The purpose of the invention is to provide PIN-based
              methods of access and billing for PCS systems—
              systems in which PINs are necessarily disassociated
              from devices....................................................................13

          2.  Other statements in the specification confirm that the
              claimed PINs are associated with users, not devices...........15

     C.   During prosecution, Fenner confirmed his definition of
          "PIN" in the specification by disclaiming PINs
          "associated with a device." ...........................................17

     D.   The District Court's construction does not render the
          specification "inconsistent" or the invention
          "inoperable." ...............................................................21

ii

      E.     The claim-differentiation principle does not support Fenner's construction. ................................................................24

   II.    If The District Court's Claim Construction Is Affirmed, The Summary Judgment Of Non-Infringement Must Stand. .....................27

CONCLUSION .......................................................................................28

CERTIFICATE OF COMPLIANCE ......................................................29

CERTIFICATE OF SERVICE ...............................................................29

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*AIA Eng'g, Ltd. v. Maggoteaux Int'l, SA,*
657 F.3d 1264 (Fed. Cir. 2011) ........................................................11

*AstraZeneca AB v. Mutual Pharma. Co.,*
384 F.3d 1333 (Fed. Cir. 2004) ........................................................12

*Chicago Bd. Options Exchange, Inc. v. Int'l Securities Exchange, LLC,*
677 F.3d 1361 (Fed. Cir. 2012) ........................................................25

*Cybor Corp. v. FAS Techs., Inc.,*
138 F.3d 1448 (Fed. Cir. 1998) (en banc) ........................................10

*D.M.I., Inc. v. Deere & Co.,*
755 F.2d 1570 (Fed. Cir. 1985) ........................................................27

*Fenner Investments,Ltd. v. Juniper Networks, Inc.,*
No. 2:05-cv-5 (E.D. Tex.)..........................................................passim

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n,*
383 F.3d 1352 (Fed. Cir. 2004) ........................................................17

*Laitram Corp. v. Morehouse Indus., Inc.,*
143 F.3d 1456 (Fed. Cir. 1998) ........................................................21

*Microsoft Corp. v. Multi-Tech Systems,*
357 F.3d 1340 (Fed. Cir. 2004) ........................................................21

*Omega Eng'g v. Raytek Corp.,*
334 F.3d 1314 (Fed. Cir. 2003) ........................................................21

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................11

*Regents of Univ. of Minnesota v. AGA Med. Corp.,*
717 F.3d 929 (Fed. Cir. 2013) ........................................................12

*Retractable Techs., Inc. v. Becton, Dickinson and Co.*,
  653 F.3d 1296 (Fed. Cir. 2011) ...........................................................................27

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995) ............................................................................17

*Toro Co. v. White Consol. Indus., Inc.*,
  199 F.3d 1295 (Fed. Cir. 1999) ..........................................................................27

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007) ..........................................................................12

## STATUTES

28 U.S.C. § 636(b)(1)...............................................................................................9

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 72 ..........................................................................9

**STATEMENT OF RELATED CASES**

No other appeal in or from the same civil action or proceeding in the lower court was previously before this or any other appellate court.  Counsel for Defendant-Appellee is not aware of any case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF THE ISSUES

The patent-in-suit relates to personal communications services (PCS) systems, and specifically, to methods of managing access to and billing for those systems using a "personal identification number."  Did the district court properly conclude that the claimed "personal identification number" includes only numbers that are "associated with" the individual user, but "***not*** associated with" the user's communications device, where:

(i)     the specification expressly defines "personal identification number" to include only numbers that are "not associated with a particular communications unit";

(ii)    that definition is consistent with the invention's avowed purpose, which is to provide methods of access and billing for PCS systems— systems in which (as the patent explains) access to telephone service is provided "independent of a telephone unit"; and

(iii)    in prosecution, the inventor distinguished a prior art communications system substantively identical to Verizon's accused system by emphasizing that in his invention, unlike the prior art, "[t]he user is identified by a personal code," and is "centered around the mobile user, not the mobile telephone"?

2

### INTRODUCTION AND SUMMARY OF ARGUMENT

Fenner's opening brief devotes over 10,000 words to undoing what his patent does in less than 30: define "personal identification number" ("PIN") to include only those numbers that are "associated with individual users," but "are ***not associated with any particular communications unit*** or physical location."  A51, 2:30-37 (emphasis added).

That act of lexicography, presented in a description of "the present invention," is itself sufficient to affirm the district court's construction of "PIN," which follows the patent's definition by including only those numbers that are "associated with the individual," but "*not* associated with the device."  Fenner offers no plausible basis for ignoring his own unequivocal definition in the specification, which precludes his litigation-driven attempt to broaden his claims to cover systems, like Verizon's, in which it is undisputed that a user's PIN is fixedly associated with a device—his or her mobile phone.

The patent's definition of "PIN" to include only numbers "not associated with a particular communications unit" is not, contrary to Fenner's assertion, a solitary sentence plucked out of context; rather, it is a necessary feature of the invention as a whole.  The specification explains that the invention relates to "personal communications services" ("PCS") systems, a hallmark of which is

telephone service that is provided "*independent of a telephone unit*."  A51, 1:24-26 (emphasis added).

PCS systems, that is, use PINs—rather than fixed associations with a particular telephone—to enable users to access their communications networks from *any* telephone.  The purpose of the invention is to provide methods for managing network access and billing for calls that can be placed from anywhere. As the patent puts it, the invention fills a perceived "need for a system of locating and tracking personal identification numbers such that billing and connecting procedures may be accomplished."  A51, 1:42-45.  In the context of the claimed invention and the benefits it is alleged to provide, a PIN that is "associated with a device" would make no sense at all.

The teachings of the specification regarding the device-independent nature of the claimed "PIN" are further confirmed by Fenner's statements to the examiner during prosecution. There, Fenner overcame a rejection over a reference, Hayes, in which authentication is based on a number that is pre-programmed into a user's phone.  Fenner distinguished Hayes by explaining that his invention, unlike Hayes, is "centered around the mobile user, not the mobile telephone," in that the "mobile user" is "identified by a *personal* code."  A2509 (emphasis added).  The association of the PIN with a *user*, rather than a phone, is precisely the basis on which Fenner overcame the Hayes art.  Fenner's arguments for distinguishing

4

Hayes operate to disclaim coverage of systems, like Verizon's, in which access and billing are tied not to a *user's* PIN, but to his or her mobile telephone.

Unable to explain away his own definition of "PIN" in the specification, his own explanation of the invention's purpose, or his disclaimer during prosecution, Fenner relies on two arguments. First, he asserts that the district court's construction cannot be correct because the specification depicts PINs being used together with a telephone to access a communications system, such that defining "PIN" to exclude numbers "associated with a device" renders the specification internally inconsistent, and the invention "inoperable." BB17-18, 25-28, 32-37. No evidence or expert testimony supports Fenner's inoperability claim; it is pure attorney argument. In any event, it is illogical: Fenner himself chose to define "PIN" to include only numbers "not associated with a particular communications unit," and he surely did not intend to render his own invention useless. Instead, Fenner's definition of "PIN" in the specification simply makes it clear that in his method, as in all PCS systems, although PINs are necessarily *used* with devices (in that the subscriber accesses the network by entering her PIN into a telephone), they are not *associated* with any device (in that the subscriber may access the network by entering that PIN into *any* telephone). There is nothing strange or contradictory about this; to the contrary, as the patent explains, this is precisely how PCS systems work.

Second, perhaps realizing the weakness of his inoperability argument, Fenner falls back on claim differentiation, arguing that because claim 19 expressly recites a "personal identification number . . . independent of a particular communications unit," it is improper to construe "personal identification number" to have that same limitation.  BB28-31.  But dependent claim 19, on which this argument relies, is fraught with ambiguity—brought to light in part by Fenner's own contradictory statements in another litigation on the same patent and the same claims—and does not provide the clear differentiation he claims for it.   In particular, the "personal identification number" recited in claim 19 has no antecedent in independent claim 18, which recites only a "personal identification *code*," which Fenner has previously argued is distinct from the "personal identification number" at issue here.  In any event, even if the differentiation were unambiguous, it could not overcome Fenner's lexicography in the specification, the device-independent nature of all PCS systems, or his disclaimers in the file history, all of which strongly support the district court's construction.

## BACKGROUND

Fenner's appeal presents a single question of claim construction, to be resolved by this Court as a matter of law based on the intrinsic evidence—the patent's claims, specification, and file history of U.S. Patent No. 5,561,706 ("the '706 patent").   That intrinsic evidence is addressed in detail in the "Argument"

section below.  The only other background necessary is a brief summary of the

proceedings below that led to the judgment of non-infringement and Fenner's

appeal.

The Markman and summary judgment proceedings below were initially

conducted before the magistrate judge, who permitted Verizon to file an early

motion for summary judgment of non-infringement based on the construction of

"personal identification number."  Following a round of letter briefing, the

magistrate ordered full briefing on both the construction of "personal identification

number" and summary judgment.  A199-202.

Fenner proposed a construction of "personal identification number" drawn

from a previous litigation, *Fenner Investments,Ltd. v. Juniper Networks, Inc.*, No.

2:05-cv-5 (E.D. Tex.).  That construction defined "personal identification number"

to mean "a number, separate from a billing code (as construed herein), identifying

an individual system user."  A7-10.  Although Fenner's proposed construction was

drawn from the *Juniper* claim construction proceedings, it was not litigated there.

Rather, Fenner and the *Juniper* defendants stipulated to that construction.  A249

(*Juniper* Markman Order, stating that "[a]t the hearing, the parties *agreed* to the

following language" for the construction of "personal identification number": "a

number, separate from a billing code, identifying an individual system user")

(emphasis added).[1]   In the *Juniper* litigation, the magistrate never had occasion to, and did not, resolve or even consider the dispute presented here.[2]

Verizon proposed a construction that adopted the stipulated construction from *Juniper* and clarified that the PIN must be "associated with the individual [system user] but not the device," based on the claim language, Fenner's own lexicography in the specification, and a clear disavowal of scope in the file history. A7-10.  Verizon drew its proposed construction directly from the specification's unequivocal definition of "personal identification number" as including only numbers "associated with individual users" and "not associated with any particular communications unit."  A51, 2:30-37.  The competing proposed constructions of "personal identification number" were thus as follows:

| **Fenner** | **Verizon** |
| --- | --- |
| "a number, separate from a billing code (as construed herein), identifying an individual system user." | "a number, separate from a billing code (as construed herein), identifying an individual system user, which is associated with the individual and not the device." |

---

[1]  The "personal identification number" lacked the relevance in the *Juniper* litigation that it has here, because *Juniper* focused on a wireless technology standard (GSM) materially different from the CDMA EV-DO technology at issue in Verizon's system.

[2]  For this reason, Fenner's assertion (at BB14) that the magistrate must have undergone an unexplained "shift in views" since the *Juniper* case is misleading.

After considering the parties' briefs and entertaining oral argument on the summary judgment motion and the associated claim constructions, the magistrate issued a provisional claim construction order adopting Verizon's proposed construction.  A1831-32.  A full Markman proceeding followed for terms not relevant to the summary judgment.  The magistrate subsequently issued a Report and Recommendation confirming his provisional construction of "PIN," concluding that the claim language, the specification, and the file history all supported a construction of "PIN" limited to numbers associated with the user, but not with a device.  A7-10.

Fenner appealed the magistrate's Report and Recommendation to the district court by filing Objections pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72, challenging the magistrate's construction of "personal identification number."  A2057-86.  The district court affirmed the magistrate's construction, adopting the Report and Recommendation—including the construction of "PIN"—in its entirety.  A2640.  Subsequently, Fenner agreed to stipulate to summary judgment of non-infringement based on the construction of "personal identification number."  A2641-44.   This appeal followed.

## ARGUMENT

The only issue in this case is whether the district court correctly construed "PIN" to include only numbers that are "associated with" individuals but "not

9

associated with" a device.  As of the filing of this brief, the Court reviews this issue *de novo*.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).[3]

For all the reasons that follow, the district court's construction of "personal identification number" is correct, and the judgment of non-infringement should be affirmed.

## I.    The Intrinsic Evidence Overwhelmingly Demonstrates That The District Court's Construction Of "Personal Identification Number" Is Correct.

The disputed claim term is "personal identification number."  As a matter of plain and ordinary meaning,  the adjective "personal" means "associated with a *person*."  Fenner is essentially asking the Court to delete the word "personal from the claim language and leave only "identification number."  The Court should resist Fenner's invitation to rewrite the claims—an invitation that, as demonstrated below, would render the claimed "personal identification number" wholly inconsistent with the specification, the file history, and the very purpose of the claimed invention.

---

[3]    The *de novo* review paradigm established in *Cybor* is now under review by the en banc Court in *Lighting Ballast Control, LLC v. Phillips Electronics North America Corporation*, Nos. 2012-1014, -1015, the result of which could be the introduction of deference into appellate claim construction review.  In that event, the arguments for affirmance presented here will carry additional force.

## A.    The patent expressly defines "PIN" to exclude numbers "associated with" a device.

The district court was correct to define "PIN" to include only numbers "not associated with the device," because the patent defines it that way.  Describing "*the present invention*," the specification explains that the claimed "personal identification numbers" "are associated with individual users," but "are ***not*** associated with any particular communications unit or physical location." A51, 2:35-37 (emphasis added).

This is an act of lexicography.  When the inventor chooses to use the specification to give a claim term a "special definition," he has acted as his own lexicographer—and "the inventor's lexicography governs." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (internal quotation omitted).  By stating affirmatively that the claimed "personal identification numbers" ***include*** certain numbers (those "associated with individual users*"*) but ***exclude*** others (those "associated with any particular communications unit or physical location"), Fenner chose to give "PIN," as used in in his patent, a special definition.  And having defined "PIN" to exclude numbers "associated with a particular communications unit," Fenner cannot now seek a broader definition in the hope of capturing Verizon's system.  *Id.*; *see also, e.g., AIA Eng'g, Ltd. v. Maggoteaux Int'l, SA*, 657 F.3d 1264, 1276 *et seq.* (Fed. Cir. 2011).

The limiting effect of Fenner's lexicography is confirmed by his use of the phrase "the present invention." The patent's statement that personal identification numbers are "not associated with a particular communications device" occurs in a description of Figure 1, which the specification describes as "a diagram of the present invention." A51, 2:30-32. "[D]escrib[ing] the features of the 'present invention' as a whole . . . limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007); *see also, e.g., Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013) (citing *Verizon Servs. Corp.*).

Moreover, the inventor's statement does not purport to describe *some* "personal identification numbers," or *a* "personal identification number," but "*[t]he* personal identification numbers" used in "the present invention." *Id.*, 2:30-37. The use of the definite article, especially in the context of a figure describing "*the* present invention," confirms Fenner's intention to define "PIN" as excluding numbers "associated with a particular communications unit" for all purposes. *See, e.g., AstraZeneca AB v. Mutual Pharma. Co.*, 384 F.3d 1333, 1339-40 (Fed. Cir. 2004) (concluding that inventor's use of the phrase "*the* solubizers suitable according to the invention" rather than "*a* solubizer suitable according to the invention" provided a "strong signal of lexicography").

## B. Reading the specification "as a whole" confirms that Fenner's lexicography must be given its full effect.

Fenner seeks to avoid the specification's express definition of "personal identification number" by ignoring it, in favor of a consideration of "the specification as a whole" untethered from the actual language within it—a consideration which, he claims, makes the specification's definition of "PIN" inconsistent with the rest of the disclosure. BB32-37.  However, when the claimed "personal identification number" is considered in the context of the specification, it becomes clear that a user's PIN *must* be disassociated from the user's (or any other) device.

### 1. The purpose of the invention is to provide PIN-based methods of access and billing for PCS systems—systems in which PINs are *necessarily* disassociated from devices.

The specification is clear about the context in which Fenner's invention arose and operates.  It first describes conventional prior art communications systems, in which "billing and system management procedures are *associated with the telephones* present in a household or business," and "billing charges are *associated with the telephone* and *not with the individual* making the call."  A51, 1:16-22 (emphasis added).  In a traditional wireline system, for example, both system access and billing are directly associated with a subscriber's home phone. Anyone using that phone can access the network, and the bill will be sent to the subscriber—even if the call was actually made by a house guest.

Having described traditional communications systems, the patent then
contrasts such conventional systems with a newer variant, "personal
communications systems" (PCS), which were "developed as a method for
identifying telephone services *independent of a telephone unit*." A51, 1:23-26.
Fenner explains that PCS systems achieve the separation of the service from the
calling device by giving "each telephone user" a "personal identification number,"
such that "[b]illing and call servicing *are identified with the individual personal
identification number and not with a telephone unit*." *Id*. at 1:24-30. This is the
patent's first use of the term "personal identification number," and it identifies the
personal identification number as the mechanism through which PCS systems
make network access independent of any particular telephone. The patent
describes a modified PCS designed to solve a problem posed by the device-
independent nature of PCS systems—namely, that "[u]nder the PCS concept, the
personal identification numbers are not geographically constant and can move
about." *Id*. at 1:35-36. It offers the invention as a "solution[ ] as to how the
management and billing of personal identification numbers can be accomplished"
in such mobile systems. The invention thus falls squarely within the context of
user-centric PCS systems, *i.e.*, communication systems in which "billing and call
services are identified with the personal identification number and not with a
telephone unit." *Id*. at 1:24-26. Fenner does not dispute this. *See* BB6 ("The

14

'706 patent's inventions were developed under the concept of "personal

communications services" or "PCS.").

It is in this context of device-independent PCS systems that the specification

makes its statement unequivocally defining "PIN":

> Referring now to FIG. 1, wherein there is shown a block diagram of
> the present invention.  A plurality of personal identification numbers 2
> are able to communicate with a personal communications systems
> switch 4 via wire line or radio frequency links.  *The personal
> identification numbers 2 are not associated with any particular
> communications unit or physical location but are associated with
> individual users*.

A51, 2:30-37 (emphasis added).

In context, Fenner's definition simply confirms that the "PIN" that

"communicat[es] with a personal communication systems switch" in his invention

operates in the same way that PINs operate in other PCS systems—that is,

independently of any device.  The entire field of the invention (PCS systems), and

the problem it purports to solve (creating effective access and billing mechanisms

that track users, rather than devices), requires that the PIN *not* be associated with a

device.

## 2. Other statements in the specification confirm that the claimed PINs are associated with users, not devices.

If there is any remaining doubt about the consistency of the specification

with the district court's construction, it is dispelled by other aspects of the

invention, all of which point to the requirement that a PIN *not* be "associated with" a device.

For example, the patent discloses only one method for a user to access a communications system: a "logon" procedure in which the user must manually "enter[ ] his personal identification number and billing code" into a telephone. A52, 3:66-67 and 4:1-3; A49, Fig. 3. The requirement that a user's PIN be manually entered into a device is consistent with the claimed invention's purpose: enabling effective access to and billing for PCS systems "independent of a telephone unit." A51, 1:24-26. Such a manual step would not be necessary if the PIN were already "associated with" the device.

The patent's description of anti-fraud measures further supports the conclusion that the claimed PIN is not and cannot be associated with a particular device. The "fraud protection means" operates to ensure that "a personal identification number is active in only one location." A52, 3:5-8. If a PIN is "found to be active in two non-adjacent locations," the system generates a fraud message. *Id*. at 3:8-11; *see also* A51, 2:1-3 (system generates a fraud message if a PIN is used "concurrently"); A52, 4:39-43; A53, 6:37-40 (claim 5); A54, 7:47-49 (claim 14); *id*. at 8:25-32 (claim 17). These anti-fraud measures are only necessary to the extent a user's PIN could be used by *multiple devices at the same time*—a scenario only possible if the PIN is, as the patent expressly states, "associated with

individual users" but "*not* associated with any particular communications unit." A51, 2:34-37 (emphasis added).

It is also telling that the patent, although directed to communications systems that inherently require the use of devices, scarcely mentions them. Every independent claim includes the step of "receiving . . . a personal identification number," and in every instance that PIN is received "from a mobile user." Fenner could have drafted the claims differently, to recite "receiving a personal identification number from a communications ***device***," but he did not. The patent overwhelmingly describes and claims a method of providing communications access and billing that is specifically focused on the user, not the device.

### C.     During prosecution, Fenner confirmed his definition of "PIN" in the specification by disclaiming PINs "associated with a device."

The prosecution history both confirms the teachings of the specification and provides an independent basis for affirming the district court's claim construction. The "prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir. 1995). In particular, where an applicant disclaims scope to distinguish prior art, his arguments will limit the scope of the claims. *See, e.g., Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1377 (Fed. Cir. 2004). In prosecuting the '706 patent, Fenner did exactly that.

The examiner rejected Fenner's application as invalid over U.S. Patent No. 5,210,787 to Hayes *et al.* ("Hayes"). The Hayes reference discloses a system in which a user gains access to a communications system via a process called "registration," in which a "mobile"—*i.e.,* a mobile device—*automatically* sends a "mobile identification number" (a "MIN") to the nearest base station, without user action. In Hayes, "each mobile periodically receives a signal from a base station" identified by its "system identification number" (a "SID"), and "the mobile in turn responds" to that signal "by sending to the system its MIN and its electronic serial number for registration with it as a user." A1932, 1:55-67; *see also* A1935 at 8:34-38 (describing a mobile communicating with a switch by sending its MIN "and other data such as the electronic serial number (ESN) of that particular mobile"). Individual users do not have electronic serial numbers and MINs; mobile telephones do. The Hayes art, therefore, describes a system in which access to the communications network is fixed to a device—the user's mobile phone.

Hayes's device-centric model and inability to dissociate a user from a device is precisely the basis on which Fenner distinguished Hayes and overcame the examiner's rejection during prosecution. Fenner dismissed Hayes as a "conventional cellular system," because it is "based on a mobile identification number ("MIN")" that is "equivalent to a typical wireline telephone number." A2508. As Fenner explained to the examiner, a MIN is like a wireline number in

18

that it is fixedly "assigned to a particular . . . home exchange," which maintains a list of each subscriber's MIN, "and the electronic serial number of the mobile telephone assigned to the MIN for establishing a radio link with the mobile telephone." *Id*.  Hayes requires the identification of a particular mobile device to accomplish communication.  *Id*.

In response to the examiner's rejection of his claims in light of Hayes, Fenner declared his claimed invention to be fundamentally different from Hayes, because it is "centered around the mobile user, ***not*** the mobile telephone."  A2508 (emphasis added).  Fenner explained that in his invention, unlike in Hayes, "the user," ***not*** his or her device, "is identified by a personal code."  A2509.  "A billing code, in addition to the mobile user's personal identification code, is provided by a mobile user during registration for identifying a billing cycle."  *Id*.  It was this flexibility of having the "mobile user, not the mobile telephone," specify the PIN that purportedly advanced Fenner's invention over the prior art.  Only in this manner could the correct user be billed for his or her usage independent of the calling device used.

Moreover, in sworn deposition testimony in the *Juniper* litigation asserting the same '706 patent, Fenner confirmed that his invention's distinction over the closest prior art—Hayes—was that the prior art relied on the identity of a device, rather than a person:

> Q:    But with respect to the prior art, the closest the prior art got to the personal identification number in your view was to identify a device and not the person who was using it.    Right?
>
> A:    That's my opinion.

A664-65.

In this appeal, Fenner emphasizes the role of the "home exchange" element of Hayes, but ignores the fixed relationship between the particular telephone and PIN in Hayes (the MIN).  A1932,1:55-67.  But distinguishing his method (in which the "personal identification code[] is provided by a mobile user during registration" and which is "centered around the mobile user, ***not*** the mobile telephone") necessarily requires Fenner's claimed PIN to be associated with the user and not the device, as stated unequivocally in the specification.  Were this not so, there would have been no need for Fenner to explain that his invention, unlike Hayes, is "centered around the mobile user, *not* the mobile telephone"; simply pointing out the invention's lack of a home exchange would have sufficed.[4]

---

[4] Fenner attempts to explain away his disclaimer by saying that "Hayes was 'centered around . . . the mobile telephone,'" only in the sense that "the assigned geographic location of the telephone informed how services were provided," such that "[t]he *user* had to be associated with the home exchange."  BB41 (emphasis added).  This is merely a small portion of the arguments related to Hayes.  In Hayes, it is the *telephone*, not the user, that "provides" the PIN.  Indeed, that was the whole point of Fenner's argument for overcoming Hayes—the flexibility his invention offered by having the PIN be ***not*** be associated with, and transmitted automatically  by, the mobile telephone for authenticating access to the network and for specifying different billing authorities depending on the user's desire at any given time.

Fenner's arguments for overcoming Hayes thus disclaimed the very subject matter that he now seeks to now recapture: communications access that is fixed to a device, rather than a user. Faced with his own unequivocal statements to the examiner, Fenner is forced to argue that his prosecution statements did not constitute disclaimer, because "the patent was not issued based on" that disclaimer. BB42. That argument is contrary to law: this Court has said "on numerous occasions that a patentee's statements during prosecution, *whether relied on by the examiner or not*, are relevant to claim interpretation." *Microsoft Corp. v. Multi-Tech Systems*, 357 F.3d 1340, 1350 (Fed. Cir. 2004); *see also, e.g., Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1462 (Fed. Cir. 1998). This principle is consistent with the Court's longstanding view that the purpose of file history disclaimer is to "protect the *public's* reliance on definitive statements made during prosecution." *Omega Eng'g v. Raytek Corp.*, 334 F.3d 1314, 1323-24 (Fed. Cir. 2003). Regardless of whether the examiner relied on Fenner's disclaimer, the public is entitled to rely on it. The district court's claim construction correctly gives effect to that disclaimer, and it is correct.

### D.    The District Court's construction does not render the specification "inconsistent" or the invention "inoperable."

As demonstrated above, the patent's specification supports the district court's construction in manifold ways—most powerfully, by defining "PIN" expressly to exclude numbers "associated with a particular communications unit."

Unable to avoid his own act of lexicography, Fenner urges the Court to ignore it, on the theory that it is somehow inconsistent with the rest of the specification.  He asserts that "[n]umerous portions of the specification indicate [that] there will be a direct association between a personal identification number and a device when a call is made or received," and argues that those embodiments are inconsistent with a definition of "PIN" that excludes numbers "associated with a device."   BB32.  That purported inconsistency, he argues, means that the district court's construction violates the principle that "'all portions of the written description'" should be read "'in a manner that renders the patent internally consistent,'" and also renders the invention "inoperable."   BB32  (quoting *Budde v. Harley-Davidson Inc*., 250 F.3d 1369, 1379-80 (Fed. Cir. 2001)).

But Fenner is wrong on both the facts and the law.  Contrary to his assertion, the patent includes ***no*** instances in which the claimed PIN is said to be "associated with" any device. In describing the invention, the specification employs the term "association" to describe several relationships—but none of them involve a PIN and a device.  *See, e.g.,* A51, 1:55-56, 59-60; *id*. at 2:4-5 (PIN is "associated with" service profiles); *id*. at 2:47-49 (service profiles may be "associated with" different personal or business uses).  The only instances of "association" involving a device are descriptions of the association of billing charges with a particular telephone in prior art wireline systems (*see* A51, 1:20-23), which the patent specifically

distinguishes, and the specification's express statement that in the invention, "personal identification numbers 2 are ***not*** associated with any particular communications unit." *Id*. at 2:35-37. The "inconsistency" identified by Fenner does not exist.

In any event, even if the premise of Fenner's inconsistency argument were correct, the principle of internal consistency on which it relies requires the opposite result of the one Fenner wants. Given that the specification expressly states that PINs are "***not*** associated with" particular devices, and also discloses embodiments in which PINs ***are*** "enter[ed]" into devices, the natural (and consistent) reading is simply that the mere entry of a PIN into a communications device for purposes of a particular phone call does not constitute an "association" with that device. As the specification elsewhere explains, in PCS systems a PIN provides access to telephone service via a telephone, but that access is "independent of" the "telephone unit" that happens to be used to make a particular call. A51, 1:23-25. The point of the invention is that prior to the use of a device by a user, there is no connection or relationship between the PIN and the device. It is only during the short period of use that such a temporarily relationship exists, and this temporary relationship is not what "associated" means as used in the specification. There is thus no inconsistency at all between the specification's definition of "PIN" as

excluding numbers "associated with a device" and its use of embodiments in which PINs are used with telephones.

The same principle disposes of Fenner's "inoperability" argument.  As a threshold matter, Fenner's claim that the district court's construction renders the patent "inoperable" is pure attorney argument, unsupported by any record evidence.  Fenner submitted an expert report in the Markman/summary judgment proceedings, but his expert gave no "inoperability" opinion.  A1424-30.  And for good reason: such an opinion would make no sense.  The invention is only inoperable if entering a PIN into a device to make a call constitutes a prohibited "association" of that PIN with that device.  But nothing in the patent suggests that, and there is no justification for believing that a person of ordinary skill would read the patent in such a tortured way, except Fenner's wish to avoid summary judgment.

### E.    The claim-differentiation principle does not support Fenner's construction.

Fenner also argues that "personal identification number" cannot properly be construed as limited to PINs "not associated with a device," because dependent claim 19 separately claims an embodiment "wherein the personal identification numbers of the source and the destination user are independent of a particular communications unit."  BB28-31.  If "personal identification number always

means that the number is never associated with any device," Fenner asserts, "the limitation in claim 19 would have been unnecessary."  BB29.

There are a host of problems with Fenner's claim-differentiation argument. As a threshold matter, it is not at all clear that the "personal identification number" recited in claim 19 is the "personal identification number" used elsewhere in the patent: as Fenner concedes (at 30), there is no antecedent for dependent claim 19's "personal identification number" in independent claim 18, which instead repeatedly uses the term "personal identification *code*."  *Compare* A54, 8:35, 8:40, and 8:47 (claim 18, reciting a "personal identification code") *with* 8:55 (claim 19, reciting "the method of claim 18 wherein the personal identification number . . . .") Different terms are presumed to have different meanings.  *See, e.g., Chicago Bd. Options Exchange, Inc. v. Int'l Securities Exchange, LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) ("The general presumption" is that "different terms have different meanings.").  And although Fenner now asserts (at BB30) that it is "readily apparent" that "the inventor used those two terms synonymously," he claimed exactly the opposite to the district court in the *Juniper* litigation.  There, Fenner asserted that claim 19's "personal identification number" was *different* than claim 18's "personal identification code":

> Fenner maintains that the proper construction of 'personal identification number' is a number corresponding to individual system users . . . Further, the amendment was discussing a 'personal identification code' as was claimed in claim 18, and not the 'personal

identification number' of claim 1.  Although Defendants wish to argue
that the two are one in [sic] the same, this is not correct.

A2150.  Fenner again argued that "personal identification code" and "personal

identification number" were distinct terms in the *Juniper* Markman hearing:

> THE COURT: Now, are personal identification code and personal
> identification number used interchangeably in the prosecution history
> and even in the patent apparently, claim 18 and claim 19?
>
> MR. GOVETT: Right. And -- that example from the file history that
> they have up there -- let me just explain it to you how I understand it,
> okay, and I hope it answers the question. ***The code apparently was
> intended to be something different from number in that claim.***
> Otherwise, why do you have number and not code? ... ***So what got
> claimed is code and not number in claim 18***.

A2109.

Given that claim 18 uses the distinct phrase "personal identification code"

three times, and given that dependent claim 19 clearly refers back to claim 18, the

most reasonable explanation is that the reference to "personal identification

number" in the dependent claim is intended to be a reference to the "personal

identification code" of the independent claim, which Fenner has previously argued

is a distinct term.  Otherwise, the "personal identification number" in claim 19

lacks an antecedent in the independent claim, and is invalid as indefinite.

At best, then, the patent's use of "PIN" in dependent claim 18 is highly

ambiguous.  But even if it were clear that the "PIN" of claim 19 was identical to

the "PIN" of claim 1, Fenner's claim-differentiation argument would fail in the

face of the overwhelming contrary evidence in the written description and file

history. While it is true that in general, the existence of a narrow claim counsels against imposing the limitations on that claim into a broader claim, *see, e.g., D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed. Cir. 1985), it is also true that "any presumption created by the doctrine of claim differentiation will be overcome by a contrary construction dictated by the written description or prosecution history." *Retractable Techs., Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011). To hold otherwise would permit inventors to claim subject matter broader than what is supported by their disclosure. *See, e.g., Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1302 (Fed. Cir. 1999) (explaining that "the doctrine of claim differentiation does not serve to broaden claims beyond their meaning in light of the specification").

Here, as explained in detail above, both the written description and the prosecution history dictate a construction of "personal identification number" that excludes numbers "associated with a device." Fenner may not rely on claim differentiation to recover the subject matter he so clearly disclaimed elsewhere.

## II.   If The District Court's Claim Construction Is Affirmed, The Summary Judgment Of Non-Infringement Must Stand.

Fenner has already stipulated that under the district court's claim construction of "PIN," Verizon cannot infringe claim 1. A2641-44. Affirmance of that claim construction necessarily requires affirmance of the judgment of non-infringement.

## CONCLUSION

At its core, this case is about an inventor seeking to capture via claim construction subject matter that he did not invent, that is inconsistent with invention's purpose, and that he expressly disavowed in both the written description and the file history.  The district court properly prevented that overreach.  Its claim construction, and the stipulated judgment based upon it, are correct and should be affirmed.

Dated:  January 24, 2014                  Respectfully submitted,

/s/  Geoffrey P. Eaton
Geoffrey P. Eaton
Winston & Strawn LLP
1700 K St. NW
Washington, DC 20006
(202) 282-5705
geaton@winston.com

Kevin P. Anderson
Karin A. Hessler
Wiley Rein LLP
1776 K St. NW
Washington, DC 20006
(202) 719-7000
kanderson@wileyrein.com
khessler@wileyrein.com

Caren K. Khoo
Verizon Corporate
  Resources Group Inc.
One Verizon Way, VC 54N073
Basking Ridge, NJ 07920
(908) 559-5668
caren.khoo@verizon.com

*Counsel for Appellee Cellco*
*Partnership, d/b/a Verizon Wireless*

# United States Court of Appeals
## for the Federal Circuit

*Fenner Investments, Ltd. v. Cellco Partnership*, 2013-1640

## CERTIFICATE OF SERVICE

I, Elissa Matias, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by WINSTON & STRAWN LLP, Attorneys for Appellee to print this document.  I am an employee of Counsel Press.

On **January 24, 2014** counsel for Appellee has authorized me to electronically file the foregoing **Response Brief of Defendant-Appellee** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

> Jonathan S. Franklin
> Mark Emery
> Fulbright & Jaworski L.L.P.
> 801 Pennsylvania Avenue, N.W.
> Washington, DC 20004
> 202-662-0466
> jonathan.franklin@nortonrosefulbright.com
> memery@fulbright.com
> *Counsel for Appellant*

Paper copies will also be mailed and emailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

January 24, 2014                                        /s/ Elissa Matias
                                                                    Counsel Press

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief was printed using a 14 point proportional Times New Roman font and contains 6,074 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).


January 24, 2014                                    /s/  Geoffrey P. Eaton
                                                    Counsel for Appellee